UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH MONTIE, as personal
representative of the Estate of DILLON
J. MONTIE, deceased,

      Case No. 19-cv-10455

      Plaintiff,

v.                     Stephanie Dawkins Davis
                        United States District Judge

CROSSFIRE LLC, ET AL.,

      Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [#22]**

## I. INTRODUCTION

This case arises from a fatal car crash that occurred on the morning of April 27, 2018. On that date, vehicles driven by Plaintiff's decedent, Dillon Montie, and Defendant Logan Goodrich collided near the intersection at the end of the exit ramp of Exit 9 on northbound US-23 and Summerfield Road in Summerfield Township, Monroe County, Michigan. Dillon Montie died as a result of the injuries that he sustained in the accident.

Plaintiff Joseph Montie brings the present action as the personal representative of the estate of Dillon Montie. He alleges wrongful death, negligence, vicarious liability, and a survival action against Goodrich and

Goodrich's employer at the time of the accident, defendant Crossfire, LLC ("Crossfire").  In the instant Motion for Partial Summary Judgment, Plaintiff asks this court to find that, 1) Goodrich was negligent and his negligence caused the accident that killed Dillon Montie; 2) Goodrich's employer, Crossfire LLC, is vicariously liable for the accident; and 3) three of Defendants' affirmative defenses fail as a matter of law.

For the reasons discussed herein, this court will GRANT IN PART AND DENY IN PART Plaintiff's Motion.  The court finds that issues of fact preclude a finding that Goodrich breached his duty or was the proximate cause of the accident as a matter of law.  However, the court concludes that if Goodrich is found negligent, then Crossfire is vicariously liable.  Further, the court declines to find that Defendants' affirmative defense that Dillon Montie's speeding caused the accident fails as a matter of law.  However, Defendants' affirmative defenses that Dillon Montie was on his cell phone at the time of the accident and that the roadway design caused the accident do fail as a matter of law as defendants have failed to demonstrate that there is a genuine issue of material fact as to either defense.  Finally, defense expert Roberts' Scenario B—that Dillon Montie was driving 73 to 81 miles per hour—is superseded by his Supplemental report opining that Dillon Montie was driving 70 miles per hour ± 3 miles per hour.  Roberts'

Supplemental Report shall govern any other inconsistencies between his two reports.

## II.   PROCEDURAL HISTORY

On February 14, 2019, Plaintiff filed his complaint in this court. (ECF No. 1). As noted, the complaint asserts four causes of action: 1) wrongful death/negligence of Logan Goodrich; 2) survival action; 3) vicarious liability of Crossfire, LLC; and 4) negligence of Crossfire, LLC.  *See id.*  Defendants Goodrich and Crossfire answered the complaint on March 12, 2019, asserting several affirmative defenses, including that Dillon Montie's speeding caused the accident, Dillon Montie's cell phone use was a cause of the accident, and the roadway design that obstructed visibility was a cause of the accident.  (ECF No. 6).

On January 31, 2020, Montie filed the present Motion for Partial Summary Judgment.  (ECF No. 22).  He filed a Supplement to the Motion for Partial Summary Judgment on February 6, 2020.  (ECF No. 23).  In the Supplement Plaintiff asserts that there is no evidence that Dillon Montie's speed caused the collision.  (*Id.* at PageID.240).  Alternatively, Montie requests summary judgment on defense expert Roberts' Scenario B—that Dillon Montie was driving between 73 and 81 miles per hour at the time of the collision.   (*Id.* at PageID.241).

Defendants argue in response that their affirmative defenses show that Goodrich was not negligent under the conditions and circumstances surrounding

the collision.  (ECF No. 25).  Montie filed his reply on March 23, 2020. (ECF No.

27).  On April 22, 2020, Defendants filed a supplemental brief to the Motion for

Partial Summary Judgment.  (ECF No. 30).  The supplemental brief summarizes

their expert Roberts' Supplemental and Rebuttal Report.  Roberts concludes in his

supplemental report that the collision would not have occurred if Dillon Montie

was driving at the speed limit of 55 miles per hour.  (*Id.* at PageID.589).  He also

concludes that the crash would not have occurred if Dillon Montie had steered to

the right or applied emergency braking.  *Id.*

### III. FACTUAL BACKGROUND

1. The Collision

The subject accident occurred on the morning of April 27, 2018.  (ECF No. 25,

PageID.256).  Defendant Goodrich was employed by Defendant Crossfire at the

time.  *Id.*  At approximately 7:38 a.m., Goodrich was driving a Ford F-250 truck

owned by Crossfire and traveling with one other Crossfire employee from their

hotel in Toledo, Ohio, to a project location in Petersburg, Michigan.  *Id.*  At the

same time, Dillon Montie was driving his Honda Civic sedan from his girlfriend's

home in Petersburg Michigan, to his job in Toledo, Ohio.  *Id.*  Goodrich exited

northbound US-23 using Exit 9 at Summerfield Road.  (*Id.* at PageID.264).  He

came to a complete stop at the stop sign and stop bar, preparing to make a left turn

to travel westbound on Summerfield Road.  (*Id.*; ECF No. 25-1, PageID.294).  He

then looked in both directions and did not see any oncoming cross traffic.  *Id.*

Goodrich slowly drove forward while looking to the right and to the left for

oncoming traffic.  *Id.*  He continued to proceed forward, looking to his left and to

his right.  *Id.*  When he looked to the left for a third time, he saw Dillon Montie's

car traveling eastbound on Summerfield Road towards him, about two seconds

before the crash.  *Id.*  Goodrich accelerated in an effort to get out of the way and

avoid the collision, but he was unsuccessful.  *Id.*  Dillon Montie's car struck the

driver's side of Goodrich's truck, and the front left section of the truck intruded

into the windshield of Dillon Montie's car.  (ECF No. 25-1, PageID.294).  Dillon

Montie was pronounced dead at the scene.  *Id.*

Goodrich's co-worker, James Ball, was seated in the front passenger seat of

the truck during the collision.  (ECF No. 25-1, PageID.314).  Ball told Deputy

Patrick Davison that Goodrich came to a complete stop at the stop sign before

attempting the left turn onto Summerfield Road.  *Id.*  Ball stated that he looked to

the right and saw no traffic coming.  *Id.*  Ball also relayed that Goodrich looked to

the left and did not see any traffic coming.  *Id.*  As Goodrich entered the

intersection, Ball observed Dillon Montie's car traveling at a high rate of speed.

*Id.*  Ball stated that Goodrich attempted to accelerate to avoid a collision; but the

maneuver did not work.  *Id.*

After investigating, the Monroe County Sheriff's office charged Goodrich with a Motor Vehicle Violation Causing Death (ECF No. 25-1, PageID.311). Goodrich pleaded no contest to the charge.[1]  (*Id.* at PageID.455).

2.  Roadway Design

As discussed, the crash occurred at the intersection of the exit ramp at Exit 9 on US-23 and Summerfield Road.  (*Id.* at PageID.263).  In 2017, the Michigan Department of Transportation redesigned and reconstructed the Summerfield Road bridge and overpass at the US-23 interchange.  *Id.*  The new design created a stop sign and a painted stop bar that is about 57 feet behind the fog line for Summerfield Road.  *Id.*  As a result, cars that stop at the stop sign and stop bar have an obstructed view of the bridge traffic on Summerfield Road coming from the left because of a guardrail and the elevated bridge.  (*Id.*; *see also* Def's Ex. B.). Defense expert Julius Roberts concluded that the view to the west of the US-23 northbound Exit 9 ramp, for an individual in a car stopped behind the stop sign and stop bar, is occluded or partially occluded by the guardrail and the crest of the overpass.  (ECF No. 25-1, PageID.485). Drivers who have driven on the road commented about the danger that the road presents in the comments section of an article about the April 27, 2018 collision. (*Id.* at PageID.531).  Drivers stated that

---

[1] The Federal Rules of Evidence prohibit the admission of a no contest plea as evidence against a defendant.  Fed. R. Evid. 410(a).  This court will therefore not consider Goodrich's plea in its determination of this Motion.

"you still can't see bridge traffic," "[the road] is more dangerous than it was before," and "Exit 9 is like playing a game of Russian roulette," among other things.  (*Id.* at PageID.531).

3. Dillon Montie's Speed

The speed limit on Summerfield Road is 55 miles per hour.  (ECF No. 25, PageID.265).  After the collision, the Monroe County Sheriff's Office issued a report estimating that Dillon Montie's speed was 57.7 miles per hour at the time of the accident.  (ECF No. 25-1, PageID.301).

Defendants retained Julius Roberts, a mechanical engineer who specializes in car accident investigation and reconstruction, as an expert to estimate Dillon Montie's speed of  travel at the time of the accident.  (ECF No. 25-1, PageID.461, 487).  Roberts concluded that Dillon Montie was traveling at a speed of approximately 64 miles per hour at the time of the accident, with a margin of error of plus or minus 6 miles an hour.  *Id.*  Hence, Roberts concluded that Dillon Montie was traveling at  a minimum speed of 58 miles per hour at the time of the accident and a maximum of 70 miles per hour.  *Id.*  This estimate is Roberts' Scenario A.  (*See* ECF No. 22-5, PageID.173).

Alternatively, Roberts opined that Dillon Montie was driving at approximately 73 to 89 miles per hour at the time of the accident—Scenario B. (*Id.* at PageID.172–73).  He came to this conclusion based on skid marks found at

the scene of the accident that may have been left by Dillon Montie's car.  (*Id.* at PageID.172).  However, Roberts could not conclude whether Scenario A or B was more likely to have occurred on the morning of the accident.  (*Id.* at PageID.172–73).  Roberts stated that if further evidence were discovered, then he would be able to say whether Scenario A or Scenario B was more likely.  (*Id.* at PageID.173).  Roberts also estimated that Goodrich and Dillon Montie saw each other on the road for the first time about 2.5 seconds before the collision occurred.  (ECF No. 25-1, PageID.522).

Plaintiff retained Michael DiTallo as an expert in traffic collision investigation and reconstruction to estimate Dillon Montie's speed at the time of the accident and to opine as to causation.  (ECF No. 25-1, PageID.461).  DiTallo concluded that Dillon Montie was driving at approximately 61 miles per hour at the time of the collision.  (ECF No. 22-7, PageID.186).  DiTallo opined that the collision still would have occurred even if Dillon Montie was traveling at the speed limit of 55 miles per hour, though with a different impact configuration.  *Id.*  He also opined that the crash would  have occurred even if Dillon Montie had pulled the emergency brake, but with a different impact configuration.  *Id.*  DiTallo concluded that the drivers would have seen each other clearly for approximately 3 seconds before the collision occurred and that Goodrich had enough time—3

seconds—and distance to see, perceive, and respond by stopping in order to avoid the collision. *Id.*

Defense counsel deposed DiTallo shortly after Plaintiff filed his Motion for Partial Summary Judgment. (ECF No. 23, PageID.240). Montie then filed a Supplement to his Motion after reviewing DiTallo's deposition transcript. *Id.* The Supplement moves the court to hold that Roberts' Scenario B—that Dillon Montie was travelling between 73 and 81 miles per hour—is unsupported as a matter of law. (*See* ECF No. 23).

Roberts prepared a Supplemental and Rebuttal Report after obtaining facts and physical evidence not available during the time that he prepared his initial report. (ECF No. 30). Roberts opined that Dillon Montie was traveling at approximately 70 miles per hour ± 3 miles per hour at the time of the collision. (*Id.* at PageID.610). Roberts also opined that the crash would not have occurred if Dillon Montie was traveling at the speed limit of 55 miles per hour. *Id.* He further opined that the crash could have been avoided had Dillon Montie steered to the right or applied the emergency braking. *Id.* Roberts also conceded that the new physical evidence he obtained did not support his previous Scenario B. *Id.*

4. Cell Phone Use

On the morning of the crash, Detective Jeffrey Hooper traveled to the scene of the collision.  (ECF No. 25-1, PageID.319).  He located Dillon Montie's cell phone on the road.  *Id.*  The cell phone was unlocked and had the Snapchat application open.  *Id.*  Detective Hooper attempted to keep the phone open and on the Snapchat page like he found it.  *Id.*  However, the phone locked while it was being monitored, therefore the Snapchat application was no longer visible on the phone after Detective Hooper's initial discovery of the phone.  *Id.*  Detective Hooper later performed an advanced logical extraction of the data on the phone and found no evidence that Dillon Montie was using his phone at the time of the crash.  (ECF No. 22-8, PageID.236).  However, Detective Hooper noted that he was unable to perform the most comprehensive data extraction—a physical extraction—because of the phone's software.  *Id.*

Plaintiff's counsel contacted Mr. Alexander Zbrozek, counsel to Snap, Inc., in relation to his subpoena to obtain Dillon Montie's Snapchat records from the morning of the collision. (ECF No. 22-9).  Plaintiff's counsel asked Mr. Zbrozek if Snap, Inc. would have records if a user opens/views a snap story, or if there would only be records if a user sends/receives direct snaps or messages.  (*Id.* at PageID.237).  Mr. Zbrozek replied to Plaintiff's counsel that Snap, Inc. did not have logs or communication log records for Dillon Montie on April 27, 2018—the

date of the accident.  *Id.*  Mr. Zbrozek also stated that story metadata is reflected in Snapchat communications logs.  *Id.*

Roberts, the Defendants' expert witness, did not have an opinion about whether Dillon Montie was on his cell phone or not at the time of the accident. (ECF. No. 22-5, PageID.156, 158).

5.  Logan Goodrich's Driving

Defense expert Roberts could not state conclusively whether Goodrich stopped at the stop sign and stop bar on the morning of the accident because the Event Data Recorder ("EDR") on Goodrich's truck did not start recording until after the truck had already passed the stop bar.  (ECF No. 25-1, PageID.485).

Plaintiff's expert, DiTallo, concluded that there was not enough information to conclude that Goodrich had stopped at the stop sign and stop bar.  (ECF No. 22-7, PageID.185).  However, DiTallo did conclude that if Goodrich stopped at or about the stop sign, then there was enough distance for Goodrich to have accelerated to the position and speed captured by the EDR five seconds before the crash.  *Id.*

6.  Deposition Testimony

Plaintiff's counsel deposed Goodrich on September 26, 2019.  (ECF No. 25-1, PageID.331).  During the deposition, Goodrich stated that he had driven the same route that he had taken on the morning of the accident for several days preceding the crash in order to get to his worksite.  (ECF No. 22-4, PageID.138).  Goodrich

also noticed that it was "harder to see to the left" at the intersection and that he

needed to move up "to a point where [he could] see."  (*Id.* at PageID.143).

Goodrich agreed with Plaintiff's counsel that his actions, at least in part,

contributed to the crash.  (ECF No. 25-1, PageID.456).  Goodrich also stated that

he accepted responsibility for the crash.  *Id.*  Plaintiff's counsel deposed a

representative from Crossfire, Raymond Fonseca, on November 4, 2019.  (ECF

No. 22-3, PageID.124).  During his deposition, Fonseca stated that he did not take

exception with Goodrich's admission of fault for pulling out in front of Dillon

Montie's car.  (ECF No. 22-3, PageID.125).

## III. LEGAL STANDARD

Courts must utilize the ordinary summary judgment standard when

determining a motion for partial summary judgment.  *Wuliger v. Christie*, 310 F.

Supp. 2d 897, 900–01 (N.D. Ohio 2004).  A ruling on a motion for partial

summary judgment narrows the issues that require further disposition.  *Id.*[2]

When a party files a motion for summary judgment, it must be granted "if

the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party

asserting that a fact cannot be or is genuinely disputed must support the assertion

---

[2] Plaintiff's reply references the incorrect summary judgment standard.  Plaintiff cites the summary judgment standard under Michigan Court Rule 2.116(I) and not the summary judgment standard under Federal Rule of Civil Procedure 56(a).

by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and to do so must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party only

-13-

needs to demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252–53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it carries the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those

"opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

## IV. APPLICABLE LAW

In diversity cases, this court is required to apply state substantive law in accordance with the controlling decisions of the Michigan Supreme Court. *NAS Sur Grp. v Cooper Ins. Ctr., Inc.*, 617 F.Supp.2d 581 (W.D. Mich. 2007); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994). If the state supreme court has not yet addressed the issue presented, this court must predict how it would rule, by looking to "all available data," including state appellate decisions. *Safeco Ins. Co. of Am. v. CPI Plastics Grp., Ltd.*, 625 F. Supp. 2d 508 (E.D. Mich. 2008); *Kingsley Assocs., Inc. v. Moll Plastic Crafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 2000).

## V. DISCUSSION

### A. *Negligence of Defendant Logan Goodrich*

To make out a prima facie case of negligence, a plaintiff must prove four elements: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty; (3) causation; and (4) damages. *Case v. Consumers Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000).

The duty element analyzes whether a person has a legal obligation to "govern his actions as not to unreasonably endanger the person or property of

others." *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 177 (Mich. 1993)

(quoting *Clark v. Dalman*, 150 N.W.2d 755, 760 (Mich. 1967)).  Negligence cases

assess a breach of duty under the reasonable care standard.  *Case*, 615 N.W.2d at

20.

To establish causation between an alleged wrongful act and the resulting

damages, the conduct of the accused must be both a cause in fact and a proximate

cause of the plaintiff's damages.  *Holton v. A+ Ins. Assocs., Inc.*, 661 N.W.2d 248,

253 (Mich. Ct. App. 2003).  Factual causation requires a showing that "but for the

defendant's actions, the plaintiff's injury would not have occurred."  *Ray v.

Swager*, 903 N.W.2d 366, 371 (Mich. 2017) (quoting *Skinner v. Square D. Co.*,

516 N.W.2d 475, 479 (Mich. 1994)) (internal quotations omitted).  Proximate

cause examines "the foreseeability of consequences, and whether a defendant

should be held legally responsible for such consequences."  *Id.*  Causation is

generally a matter for the trier of fact; however, if there are no factual disputes,

then the issue is one of law for the court.  *Holton*, 661 N.W.2d at 253.

Plaintiff argues that there is no genuine dispute of material fact as to whether

Goodrich's actions on the morning of the accident were negligent and caused the

accident that led to Dillon Montie's death.  Further, he argues that Crossfire is

vicariously liable for Goodrich's actions.  Defendants contend that they are not

liable for the accident because credible evidence supports their affirmative

-16-

defenses.  (ECF No. 25, PageID.269).  Hence, Goodrich's conduct was not

negligent under the conditions and circumstances present on the morning of the

collision.  *Id.*  This court must determine whether fact issues preclude a finding

that Goodrich can be found negligent and a proximate cause of the accident as a

matter of law.

### 1. Duty

Courts should examine a wide variety of factors when determining whether a

duty exists, including the relationship between the parties and the foreseeability

and nature of the risk that occurred.  *Schultz*, 506 N.W.2d at 178.  Plaintiff asserts

that Goodrich owed a duty to operate his car with the reasonable care and caution

that an ordinary prudent person would exercise under similar circumstances.  (ECF

No. 22, PageID.94).  Defendants agree that Goodrich had a duty to operate his car

with the ordinary and reasonable care and caution that a careful and prudent person

would exercise under similar circumstances.  (ECF No. 25, PageID.279).   And the

parties' conclusion is supported under Michigan law, which states that it is a

motorist's duty to operate his car with the ordinary and reasonable care and caution

that a "careful and prudent person would exercise under the same or similar

circumstances." *Zarzecki v. Hatch*, 79 N.W.2d 605, 607 (Mich. 1956).  Thus, this

court joins the parties in concluding that Goodrich owed a duty to Dillon Montie to

operate his vehicle with the same care that a prudent person would use under the same circumstances that existed on the morning of the accident.

### 2. Breach

Plaintiff contends that there is no genuine dispute about whether Goodrich breached his duty of reasonable care. (ECF No. 22, PageID.96). Plaintiff points out that Goodrich and a representative from Crossfire both admitted Goodrich's fault at their respective depositions. *Id.* To these statements of fault, Plaintiff adds Defense expert Roberts testimony that Goodrich could have avoided the collision if he had slowed down, stopped, and looked before entering the intersection. (*Id.* at PageID.98–99).

Defendants argue that Goodrich did not breach his duty because he came to a full and complete stop at the stop sign and stop bar, and he continued to look both ways upon proceeding into the intersection. (ECF No. 25, PageID.280–281). Goodrich asserts that even with these precautions, because of various other conditions, he did not see Dillon Montie's vehicle until two seconds before the collision—too late to avoid the crash. (*Id.* at PageID.281). Further, Defendants state that Dillon Montie was speeding at the time of the accident and thus not fulfilling his duty as a prudent driver. (*Id.* at PageID.282).

Courts determine if an individual breached his duty by assessing whether he exercised reasonable care. *Case v. Consumers Power Co.*, 615 N.W.2d at 20. As

noted above, reasonable care is the care "that a reasonably careful person would use under the circumstances." *Id.*

> Michigan law states:
>
> [T]he driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering the crosswalk on the near side of the intersection . . . [a]fter having stopped, the driver shall yield the right of way to a vehicle that has entered the intersection from another highway or that is approaching so closely on the highway as to constitute an immediate hazard during the time when the driver would be moving across or within the intersection.

Mich. Comp. Laws Ann. § 257.649.  Case law generally provides that "it is a motorist's duty, after stopping, to make such observations as due care under the circumstances requires.  Where a motorist's view is obscured, after stopping, extraordinary caution is required; and it may be necessary for the motorist to move into a position where he or she can efficiently observe traffic crossing his or her path, stop again, and make an effective observation in either direction."  60A C.J.S. Motor Vehicles § 836.  Michigan courts have also generally stood for the proposition that a driver must not just stop at a stop sign, but also must ensure that it is clear to proceed before entering the road.  *Heckler v. Laing*, 1 N.W.2d 484, 486 (Mich. 1942); *Gallagher v. Walter*, 299 N.W. 811, 814 (Mich. 1941); *Zuidema v. Bekkering*, 239 N.W. 333, 334 (Mich. 1931).[3]

---

[3] *But see Samyn v. Bublitz*, 90 N.W.2d 711, (Mich. 1958).  The *Samyn* plaintiff testified that he stopped at the stop sign, looked, and did not see the defendant's vehicle.  *Id.* at 713.  The plaintiff then proceeded into the intersection without looking at cross traffic.  *Id.*  The defendant was

The *Gallagher* court found that a driver had a duty to not only stop, but to look for approaching traffic.  *Gallagher*, 299 N.W. at 814.  The court explained that it would presume that the plaintiff driver would see anything that a person exercising ordinary care and caution would see under like circumstances.  *Id.*  Both the *Heckler* and *Zuidema* courts concluded that it was contributory negligence for a driver to stop at a stop sign and not observe traffic before entering into the road, especially if oncoming traffic was plainly visible.  *Heckler*, 1 N.W.2d at 486 (stating, "[i]f he did not stop or, having stopped, failed to make proper observation before entering the intersection, he was guilty of contributory negligence as a matter of law."); *Zuidema*, 239 N.W. at 334 (concluding that, "if . . . he stopped his automobile, looked to the left, and did not see what was plainly to be seen, the approach of defendant's automobile, he was guilty of contributory negligence which would bar [his] recovery.").

Plaintiff places much weight on the facts that (1) Goodrich admitted that he was partly at fault for the accident and accepted responsibility; and (2) Crossfire's representative took no issue with Goodrich's statement in that regard.  And indeed,

---

speeding and also driving on the wrong side of the highway, and the parties collided.  *Id.*  The trial court concluded that the plaintiff's actions constituted negligence as a matter of law and granted the defendant's motion for a directed verdict.  *Id.*  The Michigan Supreme Court reversed, concluding that reasonable minds could differ on the question of whether the plaintiff was guilty of contributory negligence as a matter of law.  *Id.*  *Samyn* is distinguishable from this case due to the egregious nature of the *Samyn* defendant's driving—not only was he speeding, but he was driving on the wrong side of the road.

a jury may ultimately accord those statements substantial persuasive value as Defendants are bound by them. *See Demo v. Red Roof Inns, Inc.*, 274 F. App'x 477, 478 (6th Cir. 2008); *see also Northern v. Fedrigo*, 320 N.W.2d 230, 233 (Mich. Ct. App. 1982) ("Plaintiff is bound by the statements in his deposition."); *Pete v. Iron County*, 481 N.W.2d 731, 732 (Mich. Ct. App. 1991); *Stefan v. White*, 257 N.W.2d 206, 208 (Mich. Ct. App. 1977) ("when a party makes statements of fact in a clear, intelligent, unequivocal manner, they should be considered as conclusively binding against him in the absence of any explanation or modification, or of a showing of mistake or improvidence."). *Id.* Thus, Goodrich and Crossfire, by its representative, are bound by their own statements, but plaintiff has not cited authority establishing that the statements are dispositive on the issue of whether Goodrich breached his duty as a matter of law. In order to be held legally liable for the accident, Plaintiff will have to prove that Goodrich failed to "exercise ordinary and reasonable care while operating his or her motor vehicle." *See Estate of John Conforti*, 2020 WL 6374744 (Mich. Ct. App., October 29, 2020) (citing *Zarzecki, supra*). Notably, Goodrich's statements admitting that he "at least in part contributed to the crash" and accepting responsibility do not qualify as judicial admissions. And Plaintiff has not argued that the statements do qualify as judicial admission. *Trima Corp. v. Meyers*, 572 F. App'x 347, 352 (6th Cir. 2014) (stating that "judicial admissions are formal

admissions in the pleadings"). Thus, while the statements may prove potent at a trial, they are for the jury to weigh, and not for the court.

Defendants argue that other evidence in this case supports the conclusion that Goodrich did not breach his duty. Both Goodrich and Ball stated that Goodrich came to a complete stop at the stop sign and stop bar before he proceeded into the intersection to make the left turn. Both men also stated that Goodrich continued to look for oncoming traffic as he proceeded forward from the stop sign. Plaintiff's expert, DiTallo, could not state for certain whether Goodrich had stopped at the stop sign or not. However, DiTallo concluded that EDR from Goodrich's truck showed that there was enough distance for Goodrich to have stopped at the stop sign and stop bar and then to have accelerated to the speed and position captured by his EDR five seconds before the crash.

Experts for both parties and the Monroe County Sheriff's Office investigation concluded that Dillon Montie was speeding at the time that the accident occurred, at least 57.7 miles per hour according to the Monroe County Sheriff's Office, and approximately $70 \pm 3$ miles per hour according to defense expert Roberts' Supplemental Report.[4] Plaintiff's own expert, DiTallo, concluded

---

[4] Under Michigan statute, a driver who is traveling at an unlawful speed forfeits the right of way. Mich. Comp. Law § 257.649(7). Defendants use this fact to argue that Goodrich had the right of way at the time of the accident. However, the favored driver still has a duty to exercise the care and caution that a person would exercise under similar circumstances. *Rugenstein v. Orr's Estate*, 297 N.W. 62, 63 (Mich. 1941); *see also McGuire v. Rabaut*, 92 N.W.2d 299, 301–02

that Dillon Montie was driving at approximately 61 miles per hour.  According to Roberts, the crash would not have occurred if Dillon Montie had been driving at the speed limit of 55 miles per hour.  Further, Roberts concluded that Dillon Montie could have avoided the collision had he steered to the right or applied his emergency brake.

Under the Michigan statute, Goodrich had a duty to stop at the stop sign and yield to any traffic before proceeding into the intersection.  Michigan caselaw suggests that a driver breaches his duty if he fails to look out for and yield to cross traffic after stopping at a stop sign.  Here, Goodrich has come forward with evidence that he stopped at the stop bar, looked to the left and to the right three times as he approached the intersection, and despite these precautions, he simply did not see Montie until he was fully in the traffic lane.  Plaintiff's evidence demonstrates that there was a space before entering the roadway where Goodrich's view would not have been obstructed by either the guardrail or the odd angle of the intersection.  But the vantage point shown does not replicate the environment as it appeared on the morning of the crash.  Defendants have offered evidence that the lack of full sunlight, coupled with the dark tree-lined horizon and the black asphalt,

_____

(Mich. 1958).  Therefore, the Court concludes that it is immaterial for its negligence determination whether Dillon Montie or Goodrich possessed the right of way at the time of the collision.

-23-

blended together with the dark color of Montie's car thereby affecting his ability to see it. (ECF No. 25, PageID.282; ECF No. 25-1, PageID.295, 307). Thus, both sides have proffered facts respectively detracting from and supporting Goodrich's actions under the circumstances. These are facts that bear upon the reasonableness of Goodrich's actions and are best left for the jury to weigh against the facts that Plaintiff has offered—including Goodrich's admission of fault. As discussed, the case turns on applying a reasonable person standard, "a determination that is generally left to the jury." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365 (6th Cir. 2009).

### 3. Causation

Negligence cases require a showing of factual causation and proximate causation. Factual causation requires a showing that "but for the defendant's actions, the plaintiff's injury would not have occurred." *Ray v. Swager*, 903 N.W.2d at 371 (Mich. 2017) (quoting *Skinner v. Square D. Co.*, 516 N.W.2d 475, 479 (Mich. 1994)) (internal quotations omitted). Proximate causation examines "the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Id.* In other words, the harm caused to the plaintiff must be the kind of harm that the defendant negligently risked. *Ray v. Swager*, 903 N.W.2d at 371. In order for an individual to be a proximate cause of an event, "there must be the prerequisite determination that the actor was

negligent—that is, that the actor breached a duty." *Ray v. Swager*, 903 N.W.2d at 377 (concluding that a driver could not be found to be a proximate cause of the plaintiff's injuries because the court below did not determine that the driver was negligent).

Goodrich admitted in his deposition that his actions, at least in part, contributed to the collision.  Even without Goodrich's deposition statements, it is fairly apparent that if Goodrich had not pulled into the intersection, that is, if he had remained at the top of the ramp, out of the path of traffic, the vehicles would not have collided.  The issue of proximate cause, however, is less settled. To begin with, an individual must be found to have breached a duty in order to be held proximately liable for an accident.  *Ray v. Swager*, 903 N.W.2d at 377.  This court has determined that factual disputes prevent a determination about whether Goodrich breached his duty.  Hence, the court cannot hold that Goodrich was proximately liable as a matter of law.

Further, proximate cause requires a determination of whether the collision that occurred was a foreseeable result of Goodrich's actions.  The Michigan Supreme Court has defined it thusly:

> If a man does an act and he knows, or by the exercise of reasonable foresight should have known, that in the event of a subsequent occurrence, which is not unlikely to happen, injury may result from his act, and such subsequent occurrence does happen and injury does result, the act committed is negligent, and will be deemed to be *the proximate cause* of the injury.  *Id.*at 373.

Plaintiff argues that Goodrich was the proximate cause of the accident because Dillon Montie was a foreseeable plaintiff, the collision was a foreseeable result of Goodrich's failure to confirm that the roadway was clear before driving into the intersection, and Goodrich stated in his deposition testimony that he was aware of the obstructed view on the road.  (ECF No. 22, PageID.101).   Defendants assert that Goodrich is not liable as a matter of law because Montie's unlawful speed and cell phone use were the proximate causes of the accident.  (ECF No. 25, PageID.284; ECF No. 30, PageID.590).

As the court concludes *infra*, Defendants' cell phone use affirmative defense fails as a matter of law; therefore, Montie's cell phone use was not a proximate cause of the accident.  However, other evidence creates a dispute of fact about whether Goodrich was proximately liable for the accident.  Defendants' expert concluded that the collision would not have occurred had Montie been driving the speed limit of 55 miles per hour.  (ECF No. 30, PageID.610).  Yet, plaintiff's expert concluded that the accident would have occurred even if Montie was driving the speed limit.  (ECF No. 22-7, PageID.186).  Goodrich testified at his deposition that he was aware that visibility was obstructed to the left at the intersection where the accident occurred.  (ECF No. 22-4, PageID.143).  But defendants argue that Goodrich was not required to anticipate that he would encounter a speeding driver on the overpass and further assert that Dillon Montie's speeding caused the

collision.  The record therefore contains conflicting evidence about the

foreseeability of the accident based on the negligent actions of both drivers on the

day of the collision.  On these facts, the court is unable to say, as a matter of law,

that Goodrich should be held legally responsible for the collision.

In sum, to succeed in a negligence action, a plaintiff must show that the

defendant owed him a duty, that the defendant breached his duty, and that the

defendant was a factual cause and proximate cause of the plaintiff's injuries.  Here,

Goodrich owed Dillon Montie a duty to operate his vehicle with the same care that

a prudent person would use under the same circumstances that existed on the

morning of the accident.  Disputes of fact exist concerning whether Goodrich

breached his duty.  Further, Goodrich is a but-for cause of the accident.  However,

without a determination that Goodrich breached his duty, this court cannot

determine that Goodrich was the proximate cause of the collision as a matter of

law.  And, the evidence proffered by the parties creates a genuine dispute of

material fact about the foreseeable consequences of Goodrich's actions.  For these

reasons, the court concludes that it cannot grant summary judgment in Plaintiff's

favor on the issue of liability.

### 4.  Defendants' Affirmative Defenses

Plaintiff also moves this court to find that Defendants' affirmative defenses

fail as a matter of law because Defendants are unable to produce any evidence

supporting an essential element of their affirmative defenses that Dillon Montie's speed, cell phone use, or the roadway design caused the April 27, 2018 collision. (ECF No. 27, PageID.550).

### a. Dillon Montie's Speeding

Plaintiff moves this court to find that Defendants' affirmative defense that Dillon Montie's speeding may have caused the accident fails as a matter of law. (ECF No. 22, PageID.105).  Alternatively, Plaintiff moves this court to find that Roberts' Scenario B—that Dillon Montie was driving between 73 to 89 miles per hour—fails as a matter of law.  (*Id.* at PageID.105).

Plaintiff's expert, DiTallo, concluded that Dillon Montie was driving at a speed of 61 miles per hour at the time of the accident.  Further, he found that the collision would still have occurred if Dillon Montie was traveling at the speed limit of 55 miles per hour, with a different impact configuration.

On the other hand, Defense expert Roberts' Supplemental Report concluded that the crash would not have happened if Dillon Montie was driving at the 55 mile per hour speed limit.  Further, Roberts opined that Montie and Goodrich saw each other for only 2.5 seconds prior to the crash.  Plaintiff's expert found that the drivers saw each other for 3 seconds prior to the crash, and he opined that 3 seconds was enough time for Goodrich to avoid the collision.  Roberts concluded in his Supplemental Report that no physical evidence supported his proffered

Scenario B from his initial report; therefore the court will exclude Scenario B as a possible scenario.

Based on the different conclusions that the parties' experts reached regarding Dillon Montie's accelerated speed and the short time frame that the drivers saw each other before the crash, a reasonable juror could conclude that Dillon Montie's speeding could have contributed to cause the accident. For these reasons, the court does not find that Defendants' affirmative defense that Dillon Montie was speeding fails as a matter of law. However, to the extent that Roberts' Supplemental Report is inconsistent with the conclusions contained in his initial report, the Supplemental Report governs his conclusions. Therefore, Scenario B fails as a matter of law.

b.  Cell Phone Use

Plaintiff requests the court to find that Defendants' affirmative defense that Dillon Montie was on his cell phone at the time of the crash fails as a matter of law. (ECF No. 22, PageID.102). Defendants assert that the evidence leads to the conclusion that Dillon Montie was on his cell phone at the time of the accident. (ECF No. 25, PageID.278).

Courts in Michigan and elsewhere have considered what type of evidence creates a dispute of fact about cell phone use prior to a motor vehicle accident. For instance, the Michigan Court of Appeals concluded that evidence consisting of

phone records not covering the time of a car accident did not permit a reasonable inference that the defendant was distracted by talking on her cell phone before a car crash. *McCuish v. Jaffe*, No. 286807, 2009 WL 3050900, at *2 (Mich. Ct. App. Sept. 24, 2009). The *McCuish* defendant testified that she had not been on her cell phone at the time of the accident. *Id.* Billing records showed that the defendant was on her phone, but there was no evidence in the record showing the exact time of the accident. *Id.* The *McCuish* court reasoned that absent any evidence about the exact time of the accident or a witness' observation that the defendant was on her cell phone, the jury could only speculate that she was on her phone when the accident occurred. *Id.* Therefore, the court concluded that the trial court did not err by granting summary judgment for the defendant. *Id.*

The Michigan Court of Appeals similarly found that a reasonable jury could not conclude that a defendant was distracted by her cell phone at the time of a motor vehicle collision in *Lauseng ex rel. Kemeny v. Zink*. No. 287995, 2009 WL, at 5194514, at *3 (Mich. Ct. App. Dec. 17, 2009). There, the trial court found that the defendant's failure to brake before impact tended to show that her cell phone distracted her. *Id.* The plaintiff introduced the defendant's cell phone records as evidence of cell phone use at the time of the accident. *Id.* at *2. The *Lauseng* court reasoned that the cell phone records did not establish that the defendant was using her phone at the time of the accident. *Id.* It also noted that the plaintiff had

not brought forth any other evidence that the defendant was "in fact" using her cell phone at the time of the accident, such as witness testimony. *Id.* The court of appeals stated that based on the record, the only way to conclude that the driver was using her cell phone was by "speculation and conjecture, not inference from known facts." *Id.* at *3.

Courts in other districts have concluded that parties may argue that cell phone use contributed to a motor vehicle accident where cell phone records showed cell phone use in close proximity to the accident. *See Miller ex rel. Miller v. Lewis*, 963 N.Y.S.2d 837, 838–42 (N.Y. Sup. Ct. 2013) (allowing evidence of the plaintiff's cell phone use where a car accident occurred as soon as 27 seconds after the plaintiff ended a phone call); *Sciani v. Soriano*, 2007 WL 506206, at *3–4 (N.J. Super. Ct. Appl. Div. Feb. 20, 2007) (allowing cell phone use records where as little as one minute passed between a phone call and a car accident and noting that the cell phone use could have distracted the plaintiff driver). The District of Columbia Court of Appeals concluded that it was proper for a jury to hear evidence of the appellant's cell phone use as evidence of distracted driving where a witness testified that she saw the appellant talking on her cell phone immediately after a car accident. *Butts v. United States*, 822 A.2d 407, 412, 419 (D.C. Ct. App. 2003).

In this case, a detective found Dillon Montie's cell phone open and on the Snapchat application, with a Snap "story" displayed at the scene of the collision. According to defendants, the snap story had been posted some twelve hours before Montie viewed it. (ECF No. 25, PageID.277). Defendants point out that the phone can only be opened by entering a pattern code. (*Id.* at PageID.276). Therefore, Montie had to have opened the phone at some point before the collision. *Id.* The Snap story to which it was opened was viewed using a "limitless" feature, meaning that the snap image would remain displayed on the telephone irrespective of the phone's timed lock setting. (*Id.* at PageID.277). The detective performed limited analysis on the phone, but he could not perform the kind of detailed analysis of the phone's data that could reveal whether Dillon Montie was on his phone at the time of the accident or even at a time in close proximity to the accident.

Correspondence between Plaintiff's counsel and counsel for Snap, Inc. showed that Snap, Inc. does not have communication logs for Dillon Montie's Snapchat account from the morning of the accident. It is unclear whether Snap, Inc. would have records of use if Dillon Montie was on the Snapchat application and not sending messages or communicating with anyone. Plaintiff's counsel asked Snap, Inc. whether it would have records to show if a user viewed stories posted by other users as opposed to sending or receiving direct snaps/messages. (ECF No. 22-9, PageID.237). Counsel for Snap, Inc. stated, "I can confirm if Snap

had communication logs records for April 27, 2018 . . . it would have produced them . . . [t]here are no such records in Snap's custody . . . [s]tory metadata is reflected in Snapchat communications logs." *Id.* Therefore, at a minimum, there are no records showing that Dillon Montie was communicating on Snapchat at the time of the collision.   And, no witnesses testified or stated in the record that they saw Dillon Montie on his cell phone at the time of the accident.

The record evidence does not support a finding going beyond surmise and conjecture that Dillon Montie was on his cell phone or viewing it at the time of the accident.  Unlike the trial courts in other districts, there are no phone records or time stamps to show what time, if at all, Dillon Montie was on his cell phone on the morning of the collision.  There is also no eyewitness testimony that Dillon Montie was on his cell phone at the time of the accident.  Similar to the *McCuish* court, there is no time-stamped evidence of cell phone use coupled with time stamps of the accident time, or again, witness testimony that can support the conclusion that Dillon Montie was on his cell phone right before the accident. Although the Snapchat application was open on Montie's phone after the crash, the record is devoid of evidence showing the length of time that Dillon Montie's phone had been open before locking or phone record evidence showing that Montie was actually on his cell phone and distracted before the accident.  Indeed, as pointed out by Defendants themselves, once a Snap story has been opened using the

limitless feature, the story remains displayed on the phone, overriding the phone's general timeout function. And here, Defendants assert that the Snap story to which the phone was opened was posted about twelve hours before the accident—the time at which Defendants posit that Montie viewed the story. But in light of the limitless feature, the fact that the story was displayed on Montie's phone following the accident provides no support for Defendant's insistence that Montie was viewing the story at the time of the accident. If Montie opened the story at any point in the twelve hours after its posting, by defendants' own account, the image would override his phone's timeout function and remain displayed on his phone until he closed it. Thus, absent phone records or witness testimony, a reasonable fact-finder could do no more than speculate about whether Dillon Montie was on his cell phone at the time of the collision. In view of the limitless time that the story could have been displayed on the phone and the lack of evidence in the record tending to establish a timeline for when the phone or Snap story were first opened, there is no more reason to believe that Montie was looking at his phone than there is to believe he was looking at the radio dial, the speedometer, or the road ahead of him. Therefore, a trier of fact could not reasonably conclude by a preponderance of the evidence that he was on his cell phone and that this distraction could have caused the accident. For this reason, the court finds that Defendants' cell phone use defense fails as a matter of law.

c.  Roadway Design

Plaintiff asks the court to find that Defendants' roadway design affirmative defense also fails as a matter of law.  (ECF No. 22, PageID.109).  Defendants counter that the evidence demonstrates that Goodrich's visibility was significantly obstructed because of the road's unreasonably dangerous layout and therefore this court should deny summary judgment.  (ECF No. 25, PageID.272–73).

Plaintiff contends that the Defendants' roadway design affirmative defense is a red herring.  (ECF No. 22, PageID.110).  In support of this contention, he cites deposition statements from Goodrich, DiTallo, and Roberts all indicating that there was a point in Goodrich's path of travel at which he could have stopped and had a clear view before entering the intersection.  *Id.*  Because there is no dispute that there was a spot where Goodrich could have pulled up in order to see oncoming traffic, Plaintiff argues that Defendants cannot prove by a preponderance of the evidence that the roadway design or visibility caused the collision.  *Id.*  Plaintiff also points out that Goodrich confirmed that he had driven through the intersection on seven different occasions before the accident occurred in order to reach his worksite the prior week, so he was aware that he had to pull up to a point on the road where he could see oncoming traffic.  *Id.*

Defendants insist nonetheless, that the subject intersection is unreasonably dangerous because the visibility of eastbound bridge traffic on Summerfield Road

is obstructed. (ECF No. 25, PageID.269). To demonstrate the point, Defendants provide photographs showing the obstructed visibility from the stop sign. (ECF No. 25-1). They indicate that the stop sign and stop bar on the road are 57 linear feet from the fog line on Summerfield Road; therefore, cars that stop at the stop sign and stop bar cannot see eastbound traffic on Summerfield road. (*Id.* at PageID.270).

Defendants also point to comments from drivers who responded to a news article reporting on the collision in which readers described the intersection as dangerous and complained about not being able to see traffic. *Id.* They buttress the above with information from their expert Roberts' report, wherein he determined that the stop bar is 57 linear feet from the intersection, or 65 feet back from the intersection when measured along the curved path of a left-turning car. (*Id.* at PageID.271). Therefore, a driver has to drive over 65 feet beyond the stop sign and stop bar to reach the intersection. *Id.* Defendants further assert that the solid metal guardrail and the elevation of the bridge obstruct a driver's visibility. *Id.* Therefore, drivers have less time to observe and compensate for oncoming cross traffic. (*Id.* at PageID.272). Finally, Defendants rely on Roberts' finding that Goodrich and Montie would have been able to see each other's vehicles for only 2.5 seconds before the crash, and DiTallo's conclusion that the drivers would have seen each other 3 seconds before the collision occurred. *Id.*

Considering the arguments of both parties, the court concludes that Defendants' roadway design affirmative defense fails as a matter of law.  In order to find that the affirmative defense survives—i.e. that there is a genuine dispute of material fact—the court must find that a jury could reasonably conclude at trial that the roadway design was a cause of the collision by a preponderance of the evidence.  Defendants' evidence includes photographs of the obstructed roadway view from the stop sign, comments from other drivers about the obstructed view and dangerousness of Summerfield Road, expert testimony that the stop sign was 57–65 feet from the intersection, and expert testimony that Goodrich and Montie saw one another for 2.5–3 seconds before the collision.  All of this evidence, considered together and in the light most favorable to Goodrich, does not allow a reasonable juror to conclude by a preponderance of the evidence that the roadway design caused the accident.  To begin with, Goodrich stated in his deposition testimony that he was familiar with the intersection where the collision occurred because he had driven it every day for seven days in a row at roughly the same time of the morning in the days leading up to the date of the crash.  He also admitted that he knew it was harder to see on the left at the intersection and that he had to drive up to a point where he could see.  (ECF No. 22-4, PageID.141-143).  He further confirmed that there was a point short of being in the lane of traffic at which he could establish an unobstructed view to the left. (*Id.* at PageID.147).

-37-

Moreover, Defendants' expert, Roberts, also stated that there was a point to which a driver could pull up without encroaching the driving lane and see oncoming traffic with no obstruction.  (ECF No. 22-5, PageID.163–64).  And Plaintiff's expert DiTallo agreed that there was enough space for a car to pull "forward and stop without entering the shoulder and/or travel lane of Summerfield Road" in order to get a clear view of oncoming traffic.  (ECF No. 22-7, PageID.187).

The record therefore reflects a showing that although visibility was obstructed at certain points on Summerfield Road at the time of the collision, there was a point on the road where Goodrich could have stopped and had a clear view of oncoming traffic before entering the traffic lane and Goodrich knew that he needed to pull up in order to see oncoming traffic.  Yet, armed with this knowledge, Goodrich did not stop and look to the left at the unobstructed point, but rather moved forward into the lane of traffic where he encountered Montie's vehicle.  (ECF No. 22-4, PageID.146).  Goodrich presents no other evidence to support the conclusion that the roadway design and obstructed visibility caused the accident given that the evidence shows that the obstruction abated at a point where yielding to oncoming traffic was still possible.  In view of the parties' agreement that there existed a point of unobstructed view available to Goodrich before he entered the lane of traffic, a trier of fact could not reasonably conclude by a preponderance of the evidence that the roadway was the cause of the accident.

-38-

The court therefore concludes that Defendants' roadway design affirmative defense fails as a matter of law.

### 5. Vicarious Liability of Defendant Crossfire LLC

Montie asserts that Goodrich was acting in the course and scope of his employment at the time of the accident with Dillon Montie.  (ECF No. 22, PageID.102).  Montie also contends that Defendants admit that Goodrich was acting in the course and scope of his employment during the accident.  *Id.* Therefore, Montie moves this court to find that Defendant Crossfire LLC is vicariously liable for the accident that is the subject of this lawsuit.

Defendants argue that genuine issues of material fact preclude finding that Goodrich's conduct was negligent as a matter of law.  (ECF No. 25, PageID.286). Therefore, they argue that a finding that Crossfire is vicariously liable for Goodrich's conduct must also be denied.  *Id.*

Under Michigan law, the doctrine of vicarious liability holds an employer liable for the negligent acts of its employees that occur within the course of employment.  *See Rogers v. J.B. Hunt Transport, Inc.*, 649 N.W.2d 23, 28 (Mich. 2002).  Defendants do not contest Plaintiff's assertion that Goodrich was acting in the scope of his employment at the time of the accident.  (ECF No. 25, PageID.269) ("it is undisputed Goodrich was operating a vehicle owned by Crossfire in the course and scope of his employment at the time of the [c]ollision").

To the contrary, Defendants state that on the date of the accident, Goodrich was traveling to a work site with one other Crossfire employee and driving a truck owned by Crossfire.  (*Id.* at PageID.262).  Defendants instead argue that this court cannot find Crossfire vicariously liable for the accident because questions of fact prevent a finding that Goodrich is liable for the accident.  *Id.*

No one disputes that Goodrich was acting in the scope of his employment when the accident occurred.  Goodrich was traveling to a worksite with his colleague in a vehicle owned by his employer, Crossfire.  However, this court has held that questions of fact preclude a finding that Goodrich was negligent as a matter of law and that Goodrich was a proximate cause of the accident. Notwithstanding this conclusion, the court also concludes that, in view of the uncontested fact that the accident happened during the course of Goodrich's employment, Crossfire will be vicariously liable if Goodrich's conduct is found to be negligent and a cause of the accident.  This court therefore holds that Defendant Crossfire LLC is liable to the extent that Defendant Goodrich is found liable.

## VI. CONCLUSION

For the reasons discussed herein, the court will GRANT IN PART AND DENY IN PART Plaintiff's Motion.  The court finds that fact issues preclude a ruling that Goodrich breached his duty and that Goodrich was the proximate cause of the April 27, 2018 accident as a matter of law.  The court also concludes that

Defendants' affirmative defense that Dillon Montie was speeding remains viable. However, Defendants' affirmative defenses that Dillon Montie was on his cell phone and that the roadway design caused the accident fail as a matter of law. To the extent that Roberts' Supplemental Report is inconsistent with his initial report, the Supplemental Report governs Roberts' conclusions. Therefore, the court concludes that Roberts' Scenario B fails as a matter of law. Lastly, the court holds that if Goodrich is found negligent, then Crossfire, LLC is vicariously liable.

      SO ORDERED.

Dated:      November 30, 2020

s/Stephanie Dawkins Davis
HON. STEPHANIE DAWKINS DAVIS
United States District Court Judge
